Good morning, Your Honors. Stephen Lubliner on behalf of Appellant Enrique Nava, may he please the Court. I hope to keep two minutes back for rebuttal. The central issue here is not whether Mr. Nava gets relief from this Court, it's whether he gets to go back to District Court to have an evidentiary hearing on the two claims that he pled. Now that standard is, did he plead a legally sufficient cause of action, and was the legally sufficient cause of action not rebutted by the records that the Attorney General was obligated to produce? Now the thin record that we have from the Attorney General, primarily minute orders, does not conclusively disprove anything, but focusing on what they focus on, the facts that there had been a prior competency hearing three months before the guilty plea, and the fact that there was a change of plea colloquy, which the Attorney General did grace us with, those facts do not conclusively disprove Mr. Nava's entitlement to an evidentiary hearing either, and that flows from two lines of cases from the Supreme Court and from this circuit. First proposition, that competency in a mentally ill defendant can fluctuate over time, and the courts and counsel are obligated to be on the alert for that. And the second proposition is that a mumbled one-word plea colloquy such as we have here cannot be conclusive on the questions of competence or voluntariness. So I submit that Mr. Nava cannot lose the right to an evidentiary hearing on the record that we have. I do think that he can win the right, that the case doesn't just have to go back to the district court with an order that the Attorney General discharge its obligations to produce a complete record. As I understand the obligation of record production, it is not an adversary, an adversarial act. It is to assist the district court in analyzing the bona fides of legally sufficient causes of action to make sure that the inmate didn't just go to the law library and copy something that sounds good out of the form book. So I think we do have enough of a sense of the record that does buttress Mr. Nava's allegations of mental illness as a general matter, hence the initial doubts about competency that we're inquired into. And we do have enough of a record to buttress Mr. Nava's allegations that something acute occurred on the morning of his plea hearing. It was something that involved the presence of a doctor, albeit we don't know that doctor's involvement. It was something that involved forcible extraction. It was something that I think is enough to buttress the allegations that he does have in his district court habeas petition. Now, if the court disagrees, then it has to take the fallback position, send the case back to have all the transcripts produced and so on, so that the district court can analyze exactly what happened. Because we don't know it. The district court didn't know it. I think the Attorney General knows it. Counsel? Yes, Your Honor. Counsel, Judge Gould with a question, please. Does the record show without any doubt that he was given drugs on the evening where he allegedly tried to kill himself the night before his plea, that he was given some mind-affecting drugs? The only thing that we have in what the Attorney General produced is the minute order, and the minute order does not clarify exactly what happened with the incident or what led to his forcible extraction. The minute order does clarify that a Dr. O was present in the decision to get him shunted off to court. We don't know what Dr. O's qualifications were. We don't know what Dr. O did. Mr. Nava alleged that Dr. O was not present when the drugs that he was given were administered, so we don't have a conclusive record in the minute orders of exactly what happened on that morning. So we don't know what drugs he was given? No, sir. I don't think he did. Is there any record of that? He said he was given two shots. Right, but is there a record of what he was given that could be presented in an evidentiary hearing? Well, that's one problem with the Attorney General's production, Your Honor, is that if we had the transcript from that morning, that might shed some light on what evidence would reasonably be available. Now, it would be nice to think that there was a medical record somewhere at the jail that could be garnered through discovery processes attendant on an evidentiary hearing, but as things stand right now, we don't know that. I believe Mr. Nava had said in his traverse that he had tried to get a copy of his jail medical records, and they were stonewalling him. So I'm assuming, you know, there might be, there might not be. I'm not, you know, an expert on jail medical records maintenance. Things can get pretty slipshod as, you know, in the prisons as we have the whole health care being taken over. Did he have a problem here that your client didn't exhaust in the state court? Well, he, I don't know if it's strictly an exhaustion issue as opposed to a procedural default issue, but we have, I mean, several responses to the district courts. Why don't you answer my question? Yes, well, if that were true, that would be a problem, and then everything else falls away. Okay. Let me rephrase the question then. Why isn't it the case that your client failed to exhaust? Persuade me that you find the client exhausted. Well, I think the issue as I framed it, there are three subparts. There's first that the attorney general waived the right to the finding of procedural default by saying in the answer and in the supporting brief that the claims were exhausted, there was no procedural default, the issues were resolved on the merits, and that AIDPA applies. By not pleading a procedural default, the attorney general necessarily did not prove the adequacy and independence of the procedural default. Okay, so what you're saying to me is your client did not exhaust, but the failure to exhaust is waived. I've asked you about exhaustion.  And you want to talk about everything but exhaustion. I'm getting to exhaustion because I think we don't have to. No, I want you to get to exhaustion first because that's the question I asked. Okay. So you either, let me just make it very clear, either your client did exhaust, in which case you're going to tell me why he exhausted, or he did not exhaust, and we can take the consequences of one or the other of those things in the next step. But let's just focus on exhaustion. The client should not be found to have procedurally defaulted his claims because under this Court's opinion. I don't want to talk about procedural default. No, no, no, no. Under the Kim case. Exhaustion and procedural default are two utterly distinct concepts. The theory that he did not exhaust is based on the State court procedural defaults that were imposed under the Swain and the Duval cases, which stand for the proposition that habeas petitioners have to sufficiently plead their causes of action and attach reasonably available documentation to their State habeas petitions. That is the basis of the District Court's finding, which was never alleged. And the fact that he could have gone back and cured under Swain, it was pointed out what the problems were, and at that point the door wasn't closed. The State courts were still open. He could have cured the defect and gone back and filed another petition, adding the evidence that was pointed out to him was lacking the first time. Well, I think that gets into what Kim's scrutiny commands, and the assumption if we look from the Kim case and we look at these pleadings, I think the answer to that, while yes, that would be a door that might be open under the defaults, the reality is that you have to scrutinize these pleadings and the default that was imposed to make sure that it's not an unreasonable bar to Federal review. Now, if you look at what Mr. Nava pleaded in State court ---- Let me just take this very slowly. I mean, you keep wanting to talk about it, and this is going to be your last chance. Mr. Nava ---- If you don't ---- Mr. Nava ---- If you talk, you're not going to hear my question, in which case it's going to be impossible for you to answer it. This is going to be your last chance as far as I'm concerned. If you don't answer it now, it's fine. We'll go on to the next thing, and just be aware that that answer will be ---- that question will be unanswered in my mind and will count against your client. Now, the question I have is, did your client have an opportunity to go back to State court curing the defects that were pointed out in the orders denying habeas? Mr. Nava had, under that law, the theoretical opportunity to go back and cure those defects. Now, the ---- Stop. Stop. Okay. So the answer is yes. Did he do that? Yes or no? As far as we know, he did not do that, nor ---- As far as we know, obviously ---- No. Things that were unknown. As far as this record is ---- He did not do that. He did not do that. Okay. Now, let me ask you the next question. Now you can tell me what your argument is. Given that he did not do what he was required in the State law, and given that he could have gone back and done it, why isn't that a failure to exhaust? Because under this Court's precedent in the Kim case, which flows from the statutory command and from Supreme Court precedents as well, this Court is not allowed to take and the district court should not have taken Swain and Duvall defaults on faith as absolutely binding. It has to scrutinize under the circumstances whether it is reasonable to impose those defaults to close the door to Federal habeas relief. Now, on this record, Mr. Nava ---- I understand what you said. Kim was a case where he did, in fact, fairly present the claims to the State court. That's what we said. That he had. So we look at it, that he had. But you have told me that he did not. You have admitted you were out of the Kim exception. Well, he did not go back and try to do better than what he had done. And the point is that he couldn't have. He pled ---- I'm sorry. I'm sorry. Okay. Why couldn't he have? Well, in terms of documents, first, focusing on documents, if the grievance is that he did not produce transcripts, there was no direct appeal because he was denied a certificate of probable cause and he would not have naturally had transcripts in his possession to attach to his petitions to show what would have happened. He's required to produce reasonably available documentation. That was not reasonably available. You can't assume that he's going to get a declaration from defense counsel whose conduct he's attacking. You can't assume that he's going to get declarations from anybody else, like his girlfriend. You can't assume that he's going to easily get access to his own medical records from the Byzantine jail system. I'm sorry. I don't understand. Why can't we assume all those things? And if he has a problem with them, he has a duty to come in and show why those things were impossible. Why can't we assume that, in fact, the various things that he now wants to present in federal court are things that he could have presented then? And if that's not the case, he has to make a showing. Well, if the court is not willing to take my representations on it, then I think the solution is because this was an issue that was raised by the district court in the first instance. It was not played as part of the government's answer. And so, I think the case has to go back to allow Mr. Nava the chance in the district court to do what Your Honor is saying he is required to do in an evidentiary way under Kim, and do that in the district court, and also have a chance to demonstrate cause and prejudice. It's sort of the same inquiry. It's tantalizing. Take your representations for what? Are you an eyewitness to any of this, and were you involved in the time? No, I was not involved in the time, Your Honor. Even if I was sort of willing to believe you and say, oh, well, your counsel are here as good as under oath because you're speaking to the court, how could you possibly make any representations of your own knowledge? Well, I do state court appeals, and I know that the transcripts aren't generated if there's no appeal. You know, what you're saying could apply equally well in the district court. We could look at the state court pleading and say, this is pretty solid. I don't know what he reasonably could have done. And, of course, we're not in Mr. Nava's mind. We don't know that he could maybe have added a few facts and allegations. It's an inquiry that I think can be made by looking at the ---- Well, it's pretty fundamental. I mean, the way the federal system operates is we don't make decisions about the state courts without first giving the state courts a chance to resolve them and make factual findings. This was true before Edpa, but it certainly is true after Edpa with great force. We don't get involved in these matters unless there has been a bona fide effort to get these things resolved by the state court. I just don't see it in this case. Well, we also do not defer to, while we do not revisit the merits of state court procedural defaults under the federal system, we also do not automatically defer to the state court procedural defaults and allow them to bar federal review. If there was a timeliness rule that said you have to get your habeas petition on file one day after the case's final and direct appeal in the California Supreme Court, I think this court might have some interest in saying that that's an unreasonable barrier to federal review, you know, to use a somewhat extreme example, but that is part of the federal system. Well, but in this way, it's not unreasonable to apply it many times. Well, if it's reasonable to say you've got to present evidence, we require evidence too, and if you don't, you're not barred from going back and trying again. Sounds perfectly reasonable to me. Well, if it was applied, if it's been applied many times, it wasn't pled or proven it was applied many times. Mr. Nava wasn't given the chance to rebut under the Bennett v. Mueller and King v. Lamarck that it's consistently applied in state court. The district court did not cite anything suggesting it was applied many times. Clearly, inconsistently applied. The entire procedural default process was defective. The best thing that can be said for it, if we're not going to hold the AG to his waiver, is that Mr. Nava gets to go back to district court to make the showing in a factual way with evidence and declarations that you think he needs to make under Kim's scrutiny. He needs to go back to district court and have a chance to demonstrate cause and prejudice for the default. That's how. There is the just did the Court have any questions on the pending motion for judicial notice or which. All right. Thank you, Your Honor. Good morning, Your Honors. Ellen Birnbaum-Kerr, Deputy Attorney General for Respondent. Initially, I would like to note that Appelli's brief does have a discussion of procedural bar, which upon reexamination should not have been included. And to the extent that it was confusing, I do apologize for including some material on procedural bar, because there is no issue of procedural bar in this case. As Your Honors have mentioned, a citation by the California Supreme Court to Swain and Duvall indicates their determination that the pleading was procedurally deficient. All right. Which still leaves open the exhaustion issue. Well, yes. Indeed. If you look at page 140 no, excuse me, 150 of the record, which is the petition which was filed in the California Supreme Court, isn't there enough under the middle of that page to suggest that the issue was indeed presented? Your Honor. In other words, exhausted? Enough to get across the exhaustion hurdle. Well, Your Honor, of course, Swain and Duvall indicates that a deficiency may be corrected. And it is our argument that this was a very deficient document. First of all, if one looks at claims that is deficient, please, about the language that Judge O'Scanlan has flagged there. In other words, why is that language not adequate to exhaust the federal issue so that we could rule on whether an evidentiary hearing is needed? Well, Your Honor, first of all, there is a conflict between his first and second claim. In the first claim, this is his discussion of his mental condition, he claims that he is a schizophrenic, that he has Tourette's syndrome and other problems. In his second claim, he contends that he is a schizophrenic, he is paranoid, and he has autism. I would submit this alone is a red flag that his credibility is not the highest because he is not even consistent as to what his problems were. Yeah, but we're not testing credibility at this point. We're simply trying to identify whether he put on the record sufficient words to meet our very low threshold to show exhaustion before he come to this Court. Yes, Your Honor. Well, outside of these conflicts, I would agree that he, there was some particularity We know at least what his claims were. I do believe that it is the Duval citation which is significant here because both of his claims center around his argument that the night before his guilty plea, he tried to commit suicide, that he was taken to the hospital where he was injected with two, what he refers to as psychotropic drugs, and that because of this he was not competent to plead guilty. However, given these assertions, he did not attach a transcript of the plea of guilty. He did not attach any declaration by defense counsel, which surely could have been requested. He asked you either what these facts were, counsel's declaration, or what his mental state was. There was no documentation as to- Counsel, does the state court record show what drugs he was given that prior evening? No, it- Before his plea? Your Honor, there is utterly nothing on the record to even substantiate his basic assertion that he was injected with anything. There is no record, and he did not make or attempt to make any record as to what medication he was given, when he was given medication, how it affected him. And then if we- Well, if he says he was injected with medication, how would he know what the medication was? He wouldn't. Correct. So, I mean, it would seem to me that whoever was the doctor who treated him and the jail should, they should have some record if he was given medication and what. Correct. He does not even, at the very least, he should have requested hospital records as to what medications he was given. But we do not have that. Well, but he makes a statement on the penalty of perjury, right? So such as is there is proof, right? Well, we don't have any dates as to what was requested, when it was requested. Well, does that have to be shown on the face of the petition? Isn't this the kind of thing that the petition raises an issue and then it can be litigated by discovery? And why isn't enough what he says here? Why aren't these enough facts that if believed would entitle them to a relief? And if the state believes that these are not true, they can disprove them. Well, the state did enter into the record the transcript of the guilty plea. The record of the state court? Not at the state court level, I mean in federal court. For exhaustion. For exhaustion, right? Correct. The California Supreme Court did make this determination. In fact, Your Honor. Just by citation to Duvall? And Swain, yes. But additionally, we have the. Well, we're off the Swain issue. All right, Duvall. You're arguing Duvall. Well, we also have the unusual circumstance that he was on notice that he would need more in the way of documentation because he had had a previous denial of relief by the California Supreme, I mean by the California Court of Appeal in which there was a citation to Duvall and the statement, the petition is denying for failure to state sufficient facts or provide exhibits. He's a prisoner. Where would he get those facts? I gather they felt it was not with sufficient detail or facts. Where would he get those facts? He could have requested a declaration from counsel who was present, and he could have also requested records from the jail. I don't know how. Do we know whether he did or not? Pardon me? Do we know whether he did or not? No, we do not. And from the hospital and from jail records and from the sheriff's department. Counsel, counsel, would the state government agree that if he was given mind-altering drugs, like shortly before he pleaded guilty, that he wouldn't be competent to plead guilty at that time? No, Your Honor. There are mind-altering drugs that might have assisted him in focusing and understanding. There's no reason to assume that he was given drugs that made it more difficult. That might have been the only way it was possible for him to understand what was happening. But how do you know the answers to those questions without holding an evidentiary hearing? Well, it's speculative, except that he has a burden. Under ADETA, isn't he prohibited from receiving an evidentiary hearing unless he has developed a factual basis in state court? And he hasn't done that. Your Honors, there's – I think we're also – Under Wiggins, if he's precluded from developing the record of state court, and under our pin-holstered decision, if you can't develop the record of state court, then you don't have to. How could he have developed this record of state court if he was not given a hearing by the state court to develop the record? Well, many things were done wrong in this case by the petitioner, starting with the fact that he filed a certificate for probable cause, but not in a timely manner. It was not filed within 60 days. If Your Honors look at his certificate of – request for certificate of probable cause, one might say there were certain difficulties already. Is that still an active issue in this case, or is that mooted? By now it's – it is mooted. Well, then why are we arguing it? All right, Your Honor. I'd like to also discuss, because I think there's something telling here, that the recent case that my opponent has added to the record, Maxwell v. Rowe, which he added after briefing. I think that is typical of these cases, like McMurtry and Torres v. Pointing. There was a record before the trial court that included a history of mental illness, a history of prescribed antipsychotic medication, a showing in court that he was increasingly paranoid and increasingly psychotic, and several involuntary commitments during trial, and also a 72-hour psychiatric hold that was extended to a 14-day psychiatric hold during trial. That has nothing to do with this case. There is – if one – and I also want to add that during the plea entry, he managed to communicate quite clearly that he was annoyed with the position of the handcuffs. And so he certainly was not unable to communicate problems. He surely could have said, I can't put my thoughts together. My mind is muddled because I was given a strange drug. And we do have the comment of the deputy district attorney, if there is something you don't hear or you don't understand or you feel the pain is so overwhelming you can't pogue us, let us know. And he said okay, and he never said anything again. Additionally, I would like Your Honors to bear in mind that this was a very favorable plea he received. He was – he – it was a negotiated plea of 24 years. And while that's a fair amount of time, I do want to point out to Your Honors that there were several counts in this case. On count one alone, he was facing a term of life, consecutive to that a term of 25 years to life, consecutive to that a term of five years. Additionally, the count involving threatening and dissuading a witness involved a different victim. Surely he would have been given consecutive terms because of that different victim. And this was in a second strike case, so that sentence would have been doubled. So he was receiving a very favorable negotiated plea, which I think is a significant matter to consider. How is it significant? Well, that relates both to his inadequacy of counsel argument and I think it also indicates his mental state because he was involved in discussions that morning as to the plea. And in rereading the plea entry, he has – Well, I don't understand. If we assume, as he seems to claim, that he was given psychotropic drugs, some of which we know can really distort one's thinking significantly. I mean, some might not. I mean, I'm not an expert in these things, but I know that some of them can be quite distorting. You get enough Haldol, you get enough Thorazine, you – I mean, I don't know what these drugs might be, but they can really mess up your mind. And you would not want to make a life-altering decision. You might be able to hear the words, but you might not – where you would want to make a life-altering decision. So I'm not quite sure what you're saying, this was such a great deal, how that helps. If he's entitled to make a clear-headed judgment about whether he's going to go to trial or take this great plea, the judge did not question him about this, right? The judge did take part in the plea entry questioning briefly and asked if he – No question about his state of mind or whether he's taken any drugs. Well, he asked if he felt it was in his best interest to accept this plea, I believe, at the beginning of it. He didn't ask him about whether he'd taken any drugs or medication or anything like that. No, Your Honor. Isn't that pretty standard to ask before somebody signs away their life? There are questions, are you doing this voluntarily and knowingly? But I think we also have the rather terse statement by Dr. O that he was available for the proceeding that day. And I realize this is not a psychiatric – Counsel, counsel, Judge Gould with a question. You know, I read that statement, he's available. And correct me if I'm wrong, but I'm not seeing how that goes any bit towards whether he's competent to plea. I thought that just means he can show up in your courtroom. But how does saying he's available mean that he's competent to plead guilty? Your Honor, I agree it's not a competency determination, but it was a statement by a doctor who had been asked to determine if he was medically available. And one assumes that if he was engaging in some behavior that demonstrated an incompetent manner, this doctor would have indicated that he did not appear that he was able to take part in court proceedings if he was rambling. The doctor – we don't know if that doctor knows anything about the constitutional standards for pleading guilty, do we? No, and this was not a psychiatric determination. It was a medical determination that meant he was able to come to court that day. Yeah, he didn't have a broken leg or he wasn't bleeding profusely. Or he was not – He was not in a coma, right? Or asleep, correct. Physically, he's able to be there, but I'm not really reading the word capable to mean anything other than he can be there physically. His body can be there. There's no danger he's going to keel over and die if he's there. But I'm not reading it to be giving a doctor's opinion about his competency to plead. So if I'm wrong in that, you can – Correct. I agree it was not a competency determination, although he had been found competent two months earlier. But I agree with Your Honor's question. Okay, thank you. Thank you, Your Honor, so I would submit the matter. Unless there are any further questions. Questions. Mr. LeBlanc, I think you're out of time. We'll give you a minute or so to take it. Just a few quick points. First about the Maxwell case. Maxwell went to trial. It's going to necessarily be a longer record of acting out and so on that we're going to have here where we have a shorter disposition. We don't know what kind of record we would have about things in this case because the Attorney General did not bother to produce all the necessary materials. As far as the point about Mr. Nava and the handcuffs, if you look at the plea colloquy, it is counsel who reports that Mr. Nava has kind of whispered to him about the handcuffs. And then in the pages that go on, he makes inaudible responses. He makes the remark, the pain is in me, which you can read about as maybe being about the cuffs or as being about just his general mental state. As to the favorable disposition, if we are going to, and I argue we can't, although the Howard case says it's what you do, if you're going to pound that square peg of the hill versus Lockhart, would he have pled guilty and gone to trial, into the context of an incompetent defendant case, which you wouldn't do if he had gone to trial. Then the Howard case says that the effect of the plea deal and all matters available to defense counsel that might have affected it, that's for the evidentiary hearing. That doesn't detract from the need for the evidentiary hearing. Now, I submit that that's not the inquiry that you make if Mr. Nava had gone to trial and been convicted, and the issue is should he have been declared incompetent by court or counsel. We wouldn't say in our prejudice inquiry, well, would he have had anything good to offer to his defense counsel if he were competent? Would he have won his case? We wouldn't say that, and so that's why the hill versus Lockhart. That sounds like an awfully good deal, though. Are you sure your client really wants to go back and go to trial? Well, that's where we're at right now. I mean, we don't know what's in discovery. We have the very low burden at the preliminary hearing of when we have hearsay testimony by the police officer under the very low standard of probable cause, so I can't say here and say he wouldn't do better. I don't know. Awfully good deal. Maybe it is. Hopefully your sentence goes by somewhat quickly and you get contact visits. You don't get contact visits if you're a lifer, but anyway, that's your client's decision. Yes, Your Honor. That's all I have unless there are any more questions. Okay. Thank you. Thank you, Your Honor. The case is signed. It will stand submitted. We'll hear arguments on the last case on the calendar.
judges: Kozinski, O'scannlain, Gould